United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LONNIE ALDEN MITCHELL,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No.  13-cv-04594-WHO

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 17

Plaintiff Lonnie Alden Mitchell, Sr. seeks to overturn the decision of the Administrative Law Judge ("ALJ") denying Mitchell disability insurance benefits and supplemental security income.  There is no dispute that Mitchell suffers from a variety of impairments, some of which the ALJ found to be severe, and evidence from some doctors supports Mitchell's application for benefits.  But my review of the record is not de novo – if the ALJ's decision is supported by substantial evidence and is free of legal error, I must find for the defendant, Carolyn W. Colvin ("the Commissioner"), even if the record could support a different conclusion.  Substantial evidence, including evidence from several doctors, the testimony of the vocational expert and the ALJ's credibility determination of Mitchell's testimony, supports the ALJ's decision.  There is no legal error.  Accordingly, Mitchell's motion for summary judgment is DENIED and the Commissioner's cross-motion is GRANTED.

**BACKGROUND**

**I.  PROCEDURAL HISTORY**

Mitchell filed a Title II application for disability and disability insurance benefits on

September 17, 2009, and filed a Title XVI application for supplemental security income on September 22, 2009.  AR 9, 96-97, 203-11.  His applications were denied initially and again on reconsideration.  AR 9, 96-103, 106-10.  Mitchell requested a hearing and appeared before the ALJ on April 11, 2012.[1]  AR 6-19, 40-95.  On April 27, 2012, the ALJ denied Mitchell's claims.  AR 6, 9-10, 18-19.  On June 28, 2012, Mitchell submitted a request for review to the Appeals Council.  AR 105.  The ALJ's denial became the Commissioner's final decision when the Appeals Council declined review on August 5, 2013.  AR 1-3.  Mitchell filed this action for judicial review pursuant to 42 U.S.C. § 405(g).  *See* Plaintiff's Motion for Summary Judgment [Dkt. No. 15] at 1 ("Pltf.'s Mot.").

## II.  MITCHELL'S IMPAIRMENTS, CAPACITY, AND THE ALJ'S DECISION

In 2000, Mitchell was shot in the head at his left temple, the victim of a violent crime.  Declaration of Lonnie Mitchell [Dkt. No. 16] at 2 ("Mitchell Decl."); AR 55, 62, 467-73.[2]  He was also in a car accident in 2007.  AR 455, 457.  When he applied for benefits in 2009, Mitchell listed back pain, acute renal insufficiency, and hypertension as the conditions that limited his ability to work.  AR 219.  His back pain allegedly started around 1996 as a result of his work as a furniture mover.  AR 280.  His other ailments include pain in his legs, arms, and left shoulder, atrial fibrillation, obesity, depression, and post-traumatic stress disorder (PTSD).  AR 11-12.  He has a history of alcohol and substance abuse, which is in reported remission.  AR 12.

When Mitchell filed for benefits and at the time of the ALJ hearing, he lived in South San Francisco and cared for his young son.  AR 240, 247-48.  He indicated then that his sister came to his apartment multiple times per week to help him with housework and child care.  AR 248, 239.

---

[1] Prior to the hearing, Mitchell changed the alleged onset date of his disability from August 1, 2007 to November 20, 2009.  AR 9, 47.  The ALJ considered Mitchell's claims with November 20, 2009 as the alleged onset date.  AR 9, 47.

[2] The timing of the gunshot wound is unclear.  Notes by Dr. Barry Stein indicated that it occurred in 1991.  AR 384.  The ALJ mentioned Dr. Stein's report of a "gunshot back in 1991" during the hearing.  AR 80.  However, earlier in the hearing Mitchell testified that the gunshot wound occurred in 2000, which contemporaneous Kaiser records support.  AR 55, 62, 467-73.  Nothing in the hearing testimony, aside from the ALJ's brief reference to Dr. Stein's report, supports the gunshot wound occurring in 1991.  *See* AR 55, 62, 80.  Based on Mitchell's testimony and the Kaiser records I conclude there was only one gunshot wound, which occurred in 2000.  AR 55, 62, 467-73.

United States District Court
Northern District of California

1     Mitchell reported having worked as a construction worker between 2006 and 2008, as an office

2     furniture installer on-and-off between 1994 and 2003 and between 2003 and 2005, as a carpenter

3     between 2001 and 2003, and as a janitor between 2003 and 2004.  AR 228.

4          **A.  Mitchell's Physical Impairments**

5          **1.  Treating Physicians and Treatment Records**

6          In December 2008, Mitchell's primary care physician, Dr. James Hutchinson, referred

7     Mitchell to the pain clinic at Stanford Hospital in response to Mitchell's complaints of chronic

8     pain, back pain, and dizziness.  AR 658.  Mitchell made multiple visits to the pain center from

9     2009 through 2012.  AR 343-382, 691-706.  In 2009, Mitchell saw Dr. Alpana Gowda at the pain

10    clinic and complained that his neck, back, and leg pain prevented him from keeping a job.  AR

11    343.  In March 2009, Dr. Gowda wrote that Mitchell suspected his gunshot wound had caused the

12    damage that accounted for the pain in his back and extremities.  AR 343.  Mitchell rated his pain

13    as typically a nine on a ten-point scale, and reported that he felt 60% of his pain in his lower back

14    while 40% was in his neck.  AR 343.  He tested negative on a straight leg raise.  AR 344.  Dr.

15    Gowda also noted reports from Mitchell of dizzy spells and upper arm weakness.  AR 351, 353,

16    354.  Lumbar spine x-rays showed degenerative changes associated with osteoarthritis and

17    degenerative disc disease.  AR 351.  Dr. Gowda recommended a medial branch block injection for

18    Mitchell's lower vertebrae on the left side.  AR 351.

19         In July 2009, a nurse clinician at the pain clinic sent a letter to Dr. Hutchinson reporting

20    that Mitchell continued to complain of neck, back, and leg pain.  AR 358.  The letter proposed

21    scheduling the medial branch block that had been recommended during the initial pain clinic visit,

22    and suggested that a C-spine MRI and brain scan would also be helpful for ruling out additional

23    diagnoses.  AR 359.  The letter also indicated Mitchell had requested a disability letter from the

24    pain clinic, but that the clinic's policy was not to issue such letters.  AR 360.  At the July visit to

25    the pain clinic, Mitchell "ambulate[d] with a normal unassisted gait."  AR 359.  A few months

26    later in October 2009, his gait was described as "antalgic" with "a single point cane used in the left

27    hand."  AR 365.  In November 2009, Mitchell returned to the clinic and received an injection to

28    treat pain in his left arm that doctors suspected could be carpal tunnel syndrome.  AR 364.  A

3

United States District Court
Northern District of California

1    February 2010 clinic entry noted that Mitchell's pain had decreased very little after that injection.

2    AR 363.  At the same visit, his gait was observed as nonantalgic, with no mention of a cane.  AR

3    363.

4           Mitchell also made several additional visits to Stanford between October 2010 and January

5    2012.  AR 482-85, 479-82, 477-79, 701-02.  His symptoms remained mostly the same.  He held a

6    cane in his right hand in September 2011 and January 2012.  AR 478, 701.  Dr. Gowda indicated

7    in September 2011 that Mitchell had not consistently followed up with the pain clinic and that an

8    MRI, which Stanford physicians had recommended as early as July 2009, had not yet been

9    performed.  AR 478.

10          A January 2012 letter by Dr. Gowda updated a new primary care physician caring for

11   Mitchell, Dr. Nani Kanen, on treatment at the clinic.  AR 701.  Dr. Gowda noted, as he had after

12   the September 2011 visit, that Mitchell had "not been consistent with followup [sic] care."  AR

13   701.  After reviewing the results of a 2007 MRI, Dr. Gowda recommended a steroid injection in

14   Mitchell's spine, but Mitchell was "hesitant" over that treatment.  AR 702.  Mitchell reported that

15   he was taking no medications at all at the time.  AR 701.  Dr. Gowda closed his letter by noting

16   that Mitchell brought a functional capacity evaluation form, but that it was the clinic's policy not

17   to fill out that form or forms like it.  AR 702.  The branch block injection, which Dr. Gowda

18   recommended during Mitchell's first Stanford visit in March 2009, had not been performed as of

19   Mitchell's ALJ hearing in April 2012.  AR 54.

20          Mitchell saw Dr. James Hutchinson as his primary care physician between July 2006 and

21   March 2011.  AR 441-459, 648-658.  In February 2010, Dr. Hutchinson filled out an SSA Medical

22   Report that diagnosed Mitchell with Chronic Pain Syndrome, vertigo, cardiac palpitations,

23   depression, and PTSD.  AR 457.  As support, Dr. Hutchinson cited lab findings showing

24   degenerative osteoarthritis in Mitchell's spine and an electrocardiogram from January 2010

25   showing atrial fibrillation.  AR 458.  Other lab findings and observations were normal for

26   Mitchell's hip and heart function.  AR 456, 458.  The doctor also found "some moderate

27   limit[ation] of c. spine [and] low back tenderness."  AR 456.  The report does not describe any of

28   these conditions as severe or indicate that Mitchell is disabled or unable to work because of them.

*See* AR 455-58.  In visits to Dr. Hutchinson between March 2010 and February 2011, Mitchell continued to complain of numbness and pain in his legs, as well as pain in his left shoulder and both hands.  AR 444, 648.

Mitchell started seeing Dr. Kanen in March 2011 with similar complaints and diagnoses: dizziness and chronic pain or numbness in his left lower back, left knee, left arm, both hips, and both feet.  *See* AR 686-87, 455-58.  Dr. Kanen noted that Mitchell had "fair control" of his hypertension in March 2011.  AR 687.  During a July 2011 visit Dr. Kanen recorded that Mitchell "need[ed] a cane" due to his left lower back pain.  AR 685.  Dr. Kanen's treatment plan for that visit also listed "cane."  AR 685.  In September and October visits the same year, Dr. Kanen made the same observation that Mitchell "ambulates [with] a cane."  AR 681, 683.  In two visits to Dr. Kanen in January 2012, Mitchell still had chronic pain and was complaining specifically of swelling in his left knee.  AR 674-77.

In March 2010, Mitchell was admitted overnight to Peninsula Medical Center for chest pain.  AR 411-22.  Mitchell told doctors there he had seen Dr. Hutchinson a few days before with the same pain.  AR 413.  He also told the doctors that he had drank heavily and used several illicit drugs before the onset of the pain, including marijuana, PCP, and methamphetamines, though the pain apparently persisted for days after his drinking and drug use.  AR 415.  Mitchell also reported to the doctors that he had started a rigorous routine of cardiovascular exercise and weight lifting around the time the pain began.  AR 415, 416.  The doctors found elevated liver enzyme and creatine kinase (CK) levels.  AR 415, 416.  The doctors diagnosed Mitchell with inflammation and breakdown of muscle tissue (rhabdomyolisis).  AR 415.  They could not fully explain his elevated CK levels, but the doctors noted the cause may have been Mitchell's drug and alcohol use, or his weight lifting.  AR 415.  At the ALJ hearing, Mitchell explained that he was exercising in March 2010 according to instructions from his physical therapist.  AR 70.

Mitchell's kidneys failed in December 2004 as a result of an allergic reaction to penicillin.  AR 293-94.  The disability medical report filled out by Dr. Hutchinson in February 2010 did not include kidney problems among Mitchell's reported diagnoses.  AR 455, 457.  Similarly, his kidney function was stable after his March 2010 hospital visit, and he testified that he was

United States District Court
Northern District of California

receiving no treatments for his kidneys at the April 2012 ALJ hearing.  AR 67, 410.

Mitchell was diagnosed with atrial fibrillation in January 2010 and had an EKG performed that confirmed the diagnosis.  AR 458.  However, an EKG later on the same day showed a return to a normal heartbeat and generally normal function.  AR 458, 609.  The testifying medical expert present at Mitchell's ALJ hearing, Dr. Landau, opined that the January 2010 episode was "not medically severe."  AR 78.  Mitchell's hypertension appears rarely in the medical documentation, and it was not among his disability complaints in Dr. Hutchinson's disability report.  AR 413, 455, 457.  His cardiac exam during his March 2010 hospital visit was normal.  AR 415.

### 2.  Non-Treating Consultative Examiners

Dr. Rose Lewis and Dr. Frank Chen examined Mitchell in December 2009 and January 2012, respectively.  AR 391-95, 659-67.  Mitchell's chief complaints with Dr. Lewis were back pain, neck pain, and dizziness.  AR 391.  He also complained of numbness in his toes and difficulty sleeping.  AR 391.  Dr. Lewis concluded in her functional assessment that Mitchell could stand and walk less than two hours, and that his cane was "medically necessary" because he needed it for all distances and terrains.  AR 395.  She also found that he could not sit in one position for two hours.  AR 395.  He could lift ten pounds occasionally and frequently, but he should never climb, balance, stoop, kneel, crouch or crawl because of a lack of balance and numbness in his lower extremities.  AR 395.  His manipulative activities could not include fingering "because of the trigger finger on the left side."  AR 395.  Finally, Dr. Lewis found that Mitchell had limitations in working around heights and heavy machinery because of his balance problems.  AR 395.

In 2012, Dr. Chen recorded Mitchell's complaints of pain in his back and legs, as well as associated leg numbness.  AR 659.  He also noted chief complaints of neck pain, hypertension, and left knee pain.  AR 659.  Dr. Chen's functional assessment stated:

> The number of hours the claimant could stand and walk during an 8-hour workday is 6 hours.  He may sit for 6 hours during an 8-hour workday.  No assistive device is medically necessary.  The amount of weight the claimant could lift and carry is 50 pounds occasionally and 25 pounds frequently.  There are no functional limitations.

AR 661.  In addition to that evaluation, Dr. Chen noted that Mitchell could walk for about one

United States District Court
Northern District of California

United States District Court
Northern District of California

1    block without using a cane, even though Mitchell had used a cane on and off for about a year.  AR

2    660.  He also found that Mitchell could frequently climb stairs and ladders, balance, stoop, kneel,

3    crouch, and crawl.  AR 665.

4        **3.  Additional Evidence**

5        Mitchell filed his motion for summary judgment pro se.  He included with his motion a

6    declaration listing the conditions he currently suffers from, including his bullet wound, vertigo,

7    migraines, lack of balance, epicondylitis (tennis elbow) in the right and left arms, paralysis in the

8    lower left lumbar and right and left legs and feet, insomnia due to pain, infected kidneys, and

9    PTSD.  Mitchell Decl. at 2-3.  Mitchell states in his declaration that "[t]ime is causing symptoms

10   to progress into further deep depression."  *Id.* at 3.

11       The declaration and Mitchell's motion assert that Mitchell's current primary care

12   physician, Dr. Kanen, has found him to be permanently disabled.  *Id.* at 2; Pltf.'s Mot. at 3.  There

13   is no evidence in the Administrative Record that Dr. Kanen found Mitchell to be disabled, but

14   Mitchell attached to his declaration an "Authorization to Release Medical Information" form

15   signed by Dr. Kanen and dated March 17, 2014.  *Id.* at 5.  On that form, Dr. Kanen marked "Yes"

16   to the question asking "Does the patient have a medically verifiable condition that would limit or

17   prevent him/her from performing certain tasks?" *Id.*  The form indicated an onset date of 1998.  *Id.*

18   Dr. Kanen also answered "Yes" to "Does this person have any limitations that affect his/her ability

19   to work or participate in education or training?" and "No" to the question "Is this person able to

20   work?" *Id.*  Dr. Kanen noted that the "patient needs surgery" in space between questions on the

21   form.  *Id.*  Neither the form itself nor any other submitted documentation explains what specific

22   condition prevents Mitchell from working or what he needs surgery for.  *Id.*

23       Another document attached to Mitchell's declaration is a handwritten page providing post-

24   visit recommendations, apparently made by Dr. Dev Kumar Mishra on October 7, 2013.  *Id.* at 7.

25   The name of the patient is missing from the page, but there is a patient's date of birth that matches

26   Mitchell's.  *Id.*  The treatment notes indicate injections into Mitchell's elbows for medial

27   epicondylitis.  *Id.*  Dr. Mishra also refers Mitchell to another doctor for low back issues.  *Id.*  The

28   final pieces of new evidence introduced with the declaration are a list of medications with dates

from 2010 through 2012 (presumably medications taken by Mitchell, although the list has no patient name on it), Dr. Kanen's business card, and an appointment reminder card for Dr. Adam Rubenstein dated November 1, 2011.[3]  *Id.* at 6.

### B.  Mitchell's Psychological Impairments

The record concerning mental health diagnosis or treatment is thin, and shows no treatment visits with a mental health professional until January 2012.  AR 384, 735-39.

In April 2009, Dr. Hutchinson stated on a mental capacities form related to Mitchell's ability to participate in the Calworks welfare program that "Patient's current mental condition does not interfere [with] his ability to work or participate in Calworks activity."  AR 459.  On November 24, 2009, Mitchell saw Dr. Barry Stein, a psychiatrist, for a consultative examination related to his claim for benefits.  AR 383-389.  During the consultation Mitchell told Dr. Stein that he had no history of inpatient psychiatric stays and had never taken psychiatric medications, though he did have "some brief outpatient mental health care services" after suffering his gunshot wound.  AR 384.  Mitchell told Dr. Stein that his chronic back pain was the main cause of his depression, that he had problems sleeping and was easily fatigued, and that he had decreased energy and motivation levels.  AR 383.

Dr. Stein determined that Mitchell had symptoms consistent with depression and early onset post-traumatic stress disorder.  AR 384, 387.  Dr. Stein also observed that Mitchell, while affected by a depressed mood, made good eye contact, had a linear and goal-directed content of thought, and was cooperative and motivated in completing the evaluation.  AR 385.  Dr. Stein concluded that there was a strong link between Mitchell's depression and his history of chronic back pain; that Mitchell was unlikely to complete a normal workday or workweek without interruption from his psychological impairments; that Mitchell may need special or additional instruction for work activities; and that Mitchell may be reserved or irritable in coworker interactions or interactions with the public.  AR 388.  Dr. Stein also found that Mitchell could probably accept instructions from supervisors and perform simple repetitive tasks, though only of

United States District Court
Northern District of California

---

[3] The treatment notes of Dr. Rubenstein are discussed in the following section.

limited duration.  AR 388.

The remaining mental health treatment records are from visits by Mitchell to the San Mateo County Behavioral Health and Services facility, starting in December 2011, four months before the ALJ hearing.  *See* AR 384, 720, 736, 738.  Dr. Adam Rubenstein, a psychiatrist, saw Mitchell during an initial assessment in December 2011, which is the only documented interaction between them.  AR 735-39.  The assessment includes Mitchell's self-reports of PTSD symptoms and depression.  AR 738.  The assessment does not make any diagnoses, but it does describe Mitchell's self-reports of visually re-experiencing his gunshot trauma and an attendant increased level of arousal as "classical [sic] PTSD type symptoms."  AR 736.  Dr. Rubenstein's recommendation for treatment reads, in full, "Med eval. Potential referral to therapy – patient open to idea of therapy."  AR 738.

Dr. Rubenstein filled out an Authorization to Release Medical Information dated February 23, 2012, answering "No" to the question "Is this person able to work?" and "Yes" to the question "Does this person have any limitations that affect his/her ability to work or participate in education or training?"  AR 713.  The form indicates an onset date of January 2012 for Mitchell's disabling condition.  AR 713.  The form does not include a space for specifying what condition prevents Mitchell from being able to work or participate in education or training, and no further information is provided on the form.  AR 713.

Documentation from Mitchell's other visits to the San Mateo facility shows that Mitchell's participation in group therapy and meditation sessions was beneficial in helping him relax and relate to the experience of others.  AR 708, 711, 714, 716, 717, 719.  Mitchell also met with a counselor, Bernadette Candy Abellana, for two individual therapy sessions in February and March 2012.  AR 709, 715.  Individual therapy records describe ongoing PTSD and depressive symptoms affecting Mitchell, although the counselor did not settle on or record a primary diagnosis.  AR 709.

### C.  The ALJ's Finding of Severe and Non-Severe Impairments

In evaluating Mitchell's disability, the ALJ determined first that he has the following severe impairments: degenerative disc disease in his cervical spine and lumbar spine, degenerative

joint disease in his left knee, obesity, depression, post-traumatic stress disorder, and polysubstance abuse in reported remission.  AR 11-12.  The ALJ found that Mitchell's other potential impairments—his left shoulder impingement, his renal dysfunction, his facial gunshot wound, and his atrial fibrillation—were non-severe.  AR 12.  The ALJ also found that no evidence existed for Mitchell's complaint of carpal tunnel syndrome, based on Dr. Landau's testimony at the ALJ hearing.  AR 12.

### D.  Steps Three Through Five

At step three of the analysis, the ALJ found that Mitchell did not suffer an impairment or combination of impairments that met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  AR 12.  In analyzing Mitchell's mental impairment ("paragraph B" criteria), the ALJ determined that Mitchell did not satisfy the paragraph B criteria because he had moderate restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with concentration, persistence or pace and no episodes of decompensation. AR 12.  The ALJ found that he did not satisfy the Appendix's "paragraph C" criteria, because he did not have a medically documented history of a chronic affective disorder of at least 2 years' duration.  AR 12.  The ALJ did not rely on these findings for his later residual functional capacity determination, and instead at steps four and five made the "more detailed assessment" necessary for the psychological evaluation within a residual functional capacity determination. [4]  AR 13.

The ALJ found that Mitchell has the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he can stand and walk two hours and sit eight hours in an eight-hour day with usual breaks; can perform postural activities occasionally, except never climb ladders, ropes, or scaffolds or balance; can occasionally move his neck, but not at the extreme ranges of motion, if his head is otherwise held at a comfortable position; can hold his head in a fixed position for up to 15 to 30 minutes at a time; cannot work above shoulder level;

---

[4] A claimant's residual functional capacity is what the claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 416.945.

United States District Court
Northern District of California

> cannot work at unprotected heights or around hazardous moving
> machinery; cannot be responsible for the safety of others; is limited
> to simple repetitive one-to-three step tasks; can frequently interact
> with supervisors, and occasionally interact with coworkers and the
> public; is limited to low-stress work, defined as few changes in the
> work or its setting and few decisions required; and may be off-task
> up to 5% of the workday, in addition to normal breaks.

AR 13.  At the hearing, the vocational expert testified that the claimant could, given these

limitations, perform at least three jobs that are sufficiently available in the local and national

economy: document preparer, addresser, and surveillance system monitor.  AR 17-18.  In light of

the RFC and vocational expert findings, the ALJ found that Mitchell was not disabled and not

entitled to Title II or Title XVI benefits.  AR 10, 18-19.

## LEGAL STANDARD

### I.  DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than twelve months," and (2) the impairment is "of such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists

in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159

(9th Cir. 2012).  To determine whether a claimant is disabled, an ALJ engages in a five-step

sequential analysis as required under 20 C.F.R § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not

performing substantial gainful activity, and (2) is under a "severe" impairment.  *Id.*

§ 416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order

to be considered severe.  *Id.* § 416.909.  In the third step, the claimant must establish that his or

her impairment meets or medically equals a listed impairment described in the administrative

regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of

the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual

functional capacity determination based on all the evidence in the record; this determination is

United States District Court
Northern District of California

1    used to evaluate the claimant's work capacity for steps four and five.  *Id.* § 416.920(e).

2         In step four, the claimant must establish that his or her impairment prevents the claimant

3    from performing relevant work he or she did in the past.  *Id.* § 416.920(a)(4)(iv).  The claimant

4    bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to

5    establish [his] entitlement to disability insurance benefits."  *Tidwell v. Apfel*, 161 F.3d 599, 601

6    (9th Cir. 1998) (alterations in original); *see also Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir.

7    2007).  Once the claimant has established this prima facie case, the burden shifts to the

8    Commissioner to show at the fifth step that the clamant is able to do other work, and that there are

9    a significant number of jobs in the national economy that the claimant can do.  20 C.F.R. §§

10   416.920(a)(4)(v),(g); 416.960(c).

11   **II.  STANDARD OF REVIEW**

12        Under 42 U.S.C. § 405(g), this Court reviews the ALJ's decision to determine whether the

13   ALJ's findings are supported by substantial evidence and free of legal error.  *See Smolen v.*

14   *Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir.

15   1991) (ALJ's disability determination must be supported by substantial evidence and based on the

16   proper legal standards).  Substantial evidence means "'more than a mere scintilla,' but less than a

17   preponderance."  *Saelee v. Chater*, 94 F.3d 520, 521–22 (9th Cir. 1996) (quoting *Richardson v.*

18   *Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is "such relevant evidence as a

19   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

20   (internal quotation marks and citation omitted).

21        This Court must review the record as a whole and consider adverse as well as supporting

22   evidence.  *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is

23   susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *See*

24   *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  "However, a

25   reviewing court must consider the entire record as a whole and may not affirm simply by isolating

26   a 'specific quantum of supporting evidence.'"  *Robbins*, 466 F.3d at 882 (quoting *Hammock v.*

27   *Bowen,* 879 F.2d 498, 501 (9th Cir. 1989)); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

28   Finally, if an ALJ's error is harmless, then a reversal is unwarranted.  *See Molina v. Astrue*, 674

United States District Court
Northern District of California

1    F.3d 1104, 1111 (9th Cir. 2012).  An error is harmless when it is "inconsequential to the ultimate

2    nondisability determination."  *Molina*, 674 F.3d at 1115 (citing *Carmickle v. Comm'r. Soc. Sec.*

3    *Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008)).

### DISCUSSION

5        I conclude that the ALJ's decision was free of legal error and based on substantial

6    evidence.  The ALJ's credibility findings are adequately supported by the record, and the

7    additional evidence Mitchell introduced with his motion does not justify a remand to the ALJ for a

8    re-determination of Mitchell's disability status.

### I.   THE ALJ'S FIVE-STEP ANALYSIS

10       The ALJ properly articulated and followed the five-step analysis for determining whether

11   Mitchell was disabled for Title II and Title XVI purposes.

### A.   STEPS ONE THROUGH THREE

13       At step one, the ALJ found that Mitchell had not engaged in substantial gainful activity

14   since his November 20, 2009 alleged onset date.  AR 11.  At step two, the ALJ found that Mitchell

15   has several impairments that are severe and a few that are non-severe.  AR 11-12.  At step three,

16   the ALJ determined that those impairments did not alone or in combination equal the severity

17   necessary to match any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The

18   ALJ considered both "paragraph B" and "paragraph C" criteria in comparing Mitchell's mental

19   impairments to the listed impairments for affective disorders (12.04), anxiety-related disorders

20   (12.06), and substance addiction disorders (12.09).  AR 12-13.  The ALJ found that Mitchell's

21   mental health conditions created only moderate difficulties—not marked difficulties—in the

22   relevant functionality categories.  AR 12-13.

23       The ALJ did not explicitly say in his decision that Mitchell's physical impairments did not

24   match or equal a listing, nor did he explain how he evaluated Mitchell's impairments against

25   specific physical limitations listed in Appendix 1.  *See* AR 12.  The ALJ did expressly find that

26   certain of Mitchell's potential impairments were not severe—his heart and kidney conditions, the

27   impingement of his left shoulder, his claimed carpal tunnel syndrome, and the gunshot to

28   Mitchell's face.  AR 12.  Additionally, the medical expert who testified at the hearing, Dr. Landau,

13

said that in his view the record did not support a match for 1.02 (major joint disorders), 1.04 (spinal disorders), 2.07 (atrial fibrillation), 4.05 (heart arrhythmia), or 6.02 (kidney function).  AR 78-79.  And most significantly, the ALJ's step four RFC evaluation addressed the physical impairments the ALJ did find to be severe—his spinal degenerative disc disease, his knee degenerative joint disease, and his obesity—and implicitly found them not severe enough to match or equal a listing.  AR 11-12.  When viewed in combination with the RFC evaluation, the ALJ's statement that Mitchell "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" is sufficient, even if the ALJ did not specifically explain his determination at step three that Mitchell's physical limitations did not match a listing.  *See* AR 12-15.

### B.  RFC DETERMINATION

The ALJ made detailed RFC findings.  AR 13.  The ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  AR 14.  The ALJ also found, however, that the objective medical evidence was not fully consistent with Mitchell's subjective claims about the intensity, persistence, and limiting effects of those symptoms.  ALJ 13-14.

After reviewing the record, I find that the ALJ based his RFC analysis on substantial evidence.  The ALJ discussed the clinical observations of Mitchell's physical limitations at length, providing a detailed account of the degenerative disease in Mitchell's spine and left knee joint.  AR 14-15.  The ALJ found that MRIs of Mitchell's back and left knee demonstrated developing foraminal stenosis, osteoarthritis, joint space narrowing, and remote mild Osgood-Schlatter disease.  AR 14.  In the ALJ's view, these conditions did lead to some limitations, since Mitchell "could not perform the Romberg test bilaterally, stand independently on either leg, squat, kneel, stoop, or lean over to put on or take off his shoes."  AR 14.  Even so, the ALJ concluded that the objective clinical findings related to Mitchell's back and knee did "not correlate with significant findings on physical examination" beyond the above impairments.  AR 14.  Crucially, Mitchell exhibited a "full cervical range of motion, non-antalgic and unassisted gait, no focal sensory deficit or motor weakness, intact reflexes, and negative straight leg raise."  AR 14.  Furthermore,

United States District Court
Northern District of California

14

the ALJ credited the medical expert's testimony in finding that Mitchell's peripheral neuropathy—the numbness and pain in Mitchell's extremities—was "consistent with alcoholic neuropathy and [was] not radicular." AR 14.

### 1. The ALJ's Credibility Findings

The ALJ found that Mitchell was not fully credible in his subjective descriptions of his symptoms and limitations. AR 15-16. The factors listed by the ALJ provide clear and convincing reasons for finding Mitchell's subjective claims about his impairments only partially credible.

In evaluating a claimant's credibility, if an ALJ finds that objective medical evidence could reasonably lead to the claimant's alleged symptoms, the ALJ must provide an explanation for setting aside the claimant's allegations "by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins*, 466 F.3d at 883; *see also Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). The type of evidence that an ALJ must consider in evaluating credibility includes "the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." SSR 96-7p; *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (listing claimant's daily activities and unexplained failure to seek or follow through with treatment as legitimate credibility factors).

In the ALJ's view, multiple factors undermined Mitchell's credibility. AR 15-16. First, Mitchell's inconsistent history of seeking medical care and complying with treatment recommendations that could have ameliorated his symptoms suggested to the ALJ that Mitchell's "symptoms were not so serious as to require continued treatment." AR 16. Mitchell did not reliably schedule medical follow-up visits and did not consistently take prescribed medication. AR 15, 701 (Mitchell was "not . . . consistent with followup [sic] care" and was "difficult to treat" because he was not compliant in taking medications), 703 (treating doctor was "unaware as to what the problem is particularly" with regard to Mitchell not trialing medications). Mitchell was taking no medications as of January 2012. AR 701. Similarly, Mitchell did not pursue available conservative treatment options when he refused to get an MRI or to undergo injection therapies. AR 15-16, 54 (refusal to undergo a diagnostic epidural injection), 478 (no MRI by September

2011 when doctor initially requested it in 2009).

Additionally, the ALJ noted evidence in the record that Mitchell's activities of daily living included household and child-rearing responsibilities that he fulfilled with no help or with limited help from his sister. AR 15. Specifically, the ALJ found that Mitchell was "independently capable of self-care, light housework, preparing simple meals, paying bills, driving, playing games with his son, socializing over the phone, frequently attending church, and washing dishes." AR 15. The ALJ also noted that Mitchell successfully performed the "potentially emotionally and physically demanding task" of caring for his young son largely on his own. AR 15. Evidence backing these conclusions about Mitchell's activities of daily living is present in Mitchell's testimony, an undated claimant's function report he filled out himself, a similar function report filled out by Mitchell's sister in November 2009, and the medical notes of physicians who examined him. *See* AR 69-70, 240-43, 247-53, 659.

I find that the ALJ's credibility findings are supported by clear and convincing reasons. An unexplained lack of medical treatment for purportedly disabling conditions is relevant in determining a claimant's credibility, as is a refusal or failure to pursue available treatment options. *See Fair*, 885 F.2d at 603 (explaining that "an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony"); SSR 82-59 (claimant must follow recommended course of treatment if it would enable her to work). The record does not reflect any explanation for Mitchell's lack of treatment, such as a lack of health insurance or inability to pay, and Mitchell does not provide any reasons or justifications. When Mitchell's doctors noted that he had not complied with treatments or made recommended follow-up visits, they made no indication that ability to pay was preventing him from receiving those treatments. AR 359, 701-06. When the ALJ asked Mitchell why he had not had the recommended branch block epidural, Mitchell responded that his sister had undergone the same procedure and it did not provide her relief. AR 53-55.

The ALJ also appropriately based his credibility findings on Mitchell's daily activities. *See* AR 15; *Fair*, 885 F.2d at 603 ("[I]f a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that *are* transferable to a work

16

1    setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling

2    excess pain.").  The ALJ found Mitchell and his sister to be "credible to the extent that [their

3    reports on benefits questionnaires or in testimony] are consistent with the medical record."  AR

4    15.

5         The ALJ acknowledged that Mitchell was no longer able to go camping or biking and that

6    his impairments had led to a decreased social life.  AR 15; *see also* AR 252.  But the ALJ also

7    properly cited activities in Mitchell's daily life that supported his ability to work.  These included

8    his reported capabilities to perform light housework, prepare simple meals, pay bills, drive, play

9    games with his son, speak on the phone, attend church, and wash dishes.  AR 15; *see also* 241-43,

10   249, 251, 659.  The ALJ found that Mitchell's sister helped him with "cooking and cleaning once

11   or twice a week," which was supported by Dr. Lewis' December 2009 evaluation.[5]  AR 15, 392.

12   The ALJ also noted that Mitchell could go grocery shopping and do some cleaning with help.  AR

13   15; *see also* AR 241-42.  He was apparently "capable of rigorous exercise and cardio" in March

14   2010, though he says he performed that exercise for only a short period at his physical therapist's

15   instruction.  AR 15; *see also* AR 70, 415, 416.  Also persuasive to the ALJ in his credibility

16   finding was that Mitchell cared for his son mostly on his own.  AR 15; *see also* AR 242, 243, 248,

17   250, 251, 593, 711.  Consideration of Mitchell's ability to do these activities was appropriately

18   weighed in the ALJ's credibility determination.  *See* AR 15; *Fair*, 885 F.2d at 603.

19        **2.  The ALJ's Treatment of Medical Opinions in the Record**

20        The ALJ properly addressed the inconsistencies in the medical record, and did not commit

21   any legal error when he granted some sources greater weight than others.  *See* AR 15-17.  The

---

[5] Other parts of the record indicate more frequent help for Mitchell from his sister.  Around the
same time as Dr. Lewis' examination, Mitchell's sister answered "3-4 times a week" to the
function report form question "How much time do you spend with the disabled person and what
do you do together?"  *See* AR 239, 391.  On the same form, Mitchell's sister marked "Yes" to the
question "Does he/she need help or encouragement doing [household chores]?" and she specified
that Mitchell needed "helping out with cleaning and reminding him to do so."  AR 241.  On a
similar form, Mitchell reported that "my sister is helping me on a daily basis" with care for his
children.  AR 248.  He also indicated that he was able to do no household chores, and that "my
sister helps me all the time now."  AR 249.  Taken as a whole, the answers to these questions from
Mitchell and his sister were inconsistent with each other, and the ALJ permissibly relied on Dr.
Lewis' "once or twice a week" note to resolve the ambiguity.  *See* AR 15, 239, 248, 391-92; *Fair*,
885 F.2d at 603.

ALJ's RFC evaluation was virtually identical to the conclusions reached by the testifying medical expert, Dr. Landau.  *See* AR 13, 16, 77-87.  Without relying solely on his testimony, the ALJ gave "significant weight" to Dr. Landau's opinions because they were "consistent with the record as a whole" with regard to the limitations imposed by Mitchell's knee and back pain, and his obesity. AR 16.  I find that the ALJ permissibly followed Dr. Landau's conclusions because his opinions were themselves "supported by other evidence in the record and [were] consistent with it." *Morgan*, 169 F.3d at 600; *see also Magallanes v. Bowen*, 881 F.2d 747, 752-53 (9th Cir. 1989).

The ALJ acted properly in assigning relative weights to the reports of Mitchell's treating and examining doctors, which sometimes contained inconsistent conclusions.  *See* AR 16-17, 77-89.  Mitchell saw Dr. Gowda, Dr. Hutchinson, and Dr. Kanen numerous times over a span of years with complaints similar to the ones at issue in the ALJ hearing, but the record before the ALJ did not show any of those doctors concluding that Mitchell was disabled or could not work.  *See* AR 360, 455-59, 674-688, 702; *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

While the ALJ found from these treatment records that Mitchell suffered from a number of conditions that are "severe" for Title II and Title XVI purposes (AR 11-12), there were other indications in the treatment record that indicated Mitchell's conditions were not disabling.  Dr. Hutchinson wrote on a Calworks form in April 2009 that Mitchell's mental limitations should not prevent him from working.  AR 459.  Mitchell also told other treating physicians in a March 2010 emergency room visit that the chest pain that brought him there might have arisen from a rigorous exercise routine he had started recently.  *See* AR 15, 415-17.  Objective tests performed at the time of that visit showed normal results.  AR 415-17.  These facts provided evidence for the ALJ to evaluate Mitchell as having the capacity to perform light work with additional restrictions. *Matthews*, 10 F.3d at 680.

The ALJ afforded little weight to the opinions of the consultative examiners, Dr. Lewis and Dr. Chen, because they were not consistent with the rest of the record.  AR 16.  Dr. Landau concluded from examining the entire record that Mitchell was more capable of lifting, walking, and performing postural activities than Dr. Lewis found him to be.  *See* AR 16, 80-86. Conversely, Dr. Landau concluded that Mitchell was less capable of those activities than Dr. Chen

1    found him to be.  *See* AR 16, 80-86.  The gap between the examining consultants' respective

2    assessments meant the ALJ could appropriately rely on Dr. Landau to resolve the discrepancies

3    between them.  I find that the ALJ committed no error in relying on Dr. Landau more heavily than

4    the consultative examiners in a determination of Mitchell's RFC.  *See Morgan*, 169 F.3d at 600;

5    *Magallanes*, 881 F.2d at 752-53.

6         **3.   Mitchell's Gait and Necessity of Cane Use for Walking**

7              The ALJ's conclusion that Mitchell had a "nonantalgic and unassisted gait" differed from

8    observations by Dr. Gowda and Dr. Kanen that Mitchell either used or needed a cane for walking.

9    *See* AR 365, 478, 681, 683, 685, 701.  Although Dr. Kanen noted that Mitchell "need[ed]" a cane

10   in a July 2011 visit, there was no further documentation or discussion of the cane as a medical

11   necessity in his treatment notes.  AR 685; *see also* AR 681, 683.  Dr. Gowda's treatment notes

12   likewise never discussed the necessity of Mitchell's carrying a cane, but simply noted that he used

13   one.  AR 365, 478, 701.  Additionally, Dr. Gowda first noted Mitchell's use of a cane in October

14   2009, then described Mitchell's gait as "nonantalgic" in February 2010, and again observed use of

15   a cane in September 2011 and January 2012.  AR 363, 365, 478, 701.  The conclusions of the two

16   non-treating medical examiners also disagreed with each other with regard to the need for a cane.

17   Dr. Lewis found that the cane was "medically necessary" for Mitchell in December 2009, while

18   Dr. Chen explicitly found that Mitchell did not need a cane for walking in 2012.  AR 395, 660.

19             Reviewing the record as a whole, Dr. Landau found "no objective evidence of the

20   requirement for a cane."  *See* AR 81.  It was permissible for the ALJ to rely on Dr. Landau

21   because the evidence of Mitchell's need for a cane was unclear, and substantial evidence existed

22   for a contrary conclusion.  *See* AR 365, 478, 681, 683, 685, 701; *Morgan*, 169 F.3d at 600 ("[T]he

23   opinion of the treating physician is not necessarily conclusive as to either the physical condition or

24   the ultimate issue of disability."); *Magallanes,* 881 F.2d at 752-53.

25        **4.   Psychological Impairments in Mitchell's RFC**

26             As for evidence of psychological impairments, the ALJ relied on two sources to evaluate

27   Mitchell's limitations—the consultative examination by Dr. Stein in November 2009 and records

28   of Mitchell's visits to a mental health facility for individual therapy and group meditation between

United States District Court
Northern District of California

19

October 2011 and April 2012.  AR 15, 383-90,707-43.  Both sources indicated that Mitchell had a number of symptoms related to his PTSD and depression, including anxious mood, nightmares, and feelings of hopelessness.  AR 15, 387-88, 719.  Dr. Stein's report concluded that Mitchell "probably would have some difficulty performing work activities on a consistent basis without special or additional instruction. . . .  As his depression gets worse his pain may feel more intense."  AR 388.  Dr. Rubenstein—who only saw Mitchell once—also wrote that Mitchell was unable to work on a form dated February 2012, but did not otherwise explain the reason for that inability.  AR 713.

The ALJ noted, on the other hand, that Mitchell's depressive and PTSD symptoms were largely self-reported, while direct observation by Dr. Stein and others at least showed that Mitchell was cooperative, and that he had "good eye contact, insight and judgment."  AR 15, 385-86, 708, 711, 714, 715.  Moreover, given the claimant's lack of regular mental health care and generally benign observations at therapy appointments, the ALJ permissibly granted Dr. Stein's one-time opinion "little weight."  *See* AR 17, 384.  The ALJ likewise afforded Dr. Rubenstein's opinion "little weight" because the record did not include supporting treating records from him, the record did not explain the basis for his conclusion that Mitchell could not work, and "the few mental health treatment notes in the record are inconsistent with more than moderate functional limitations."  AR 17, 385-86, 708, 711, 714, 715.  The ALJ also pointed to evidence, including Mitchell's own hearing testimony, that he had successfully controlled his anxiety and depression with therapy, antidepressants, and group meditation practice.  AR 15, 74-75, 385-86, 708, 711, 714, 715.  The ALJ found that Mitchell's history of polysubstance abuse, which Mitchell testified was in remission since August 2010, was "not a current material factor contributing to" the RFC evaluation.  AR 15, 48-50.  Substantial evidence in the record supported all of these conclusions.

## C.  STEP FIVE

At step five, the ALJ determined that Mitchell had no past relevant work, but that jobs existed for him in the national economy in significant numbers after taking into account his age, education, work experience, and residual functional capacity.  AR 17-18.  Since the ALJ found that Mitchell had an RFC with less than the full exertional capacity associated with performing

20

1    "light work," the ALJ asked the testifying vocational expert whether jobs were available that fit

2    Mitchell's specific RFC profile.  AR 18.  The expert testified that Mitchell's RFC profile was

3    consistent with the responsibilities of three representative occupations—document preparer,

4    addresser, and surveillance system monitor—and these occupations existed in significant numbers

5    in the economy.  AR 18, 89-92.

6         Based on a review of the ALJ's decision, the vocational expert's hearing testimony, and

7    the relevant portions of the *Dictionary of Occupational Titles*,[6] the ALJ did not err in relying on

8    the vocational expert or on the *Dictionary of Occupational Titles* to find that there were sufficient

9    jobs in the national economy that Mitchell could perform with his limitations.  *See* AR 18, 89-92.

10   ## II. MITCHELL'S ADDITIONAL EVIDENCE

11        Mitchell presented additional evidence with his motion for summary judgment.  Mitchell

12   Decl. at 2-7.  Under Ninth Circuit precedent, if this new evidence is material to a disability

13   determination, and if the claimant has shown good cause for his failure to present the evidence to

14   the ALJ earlier, I must remand to the ALJ for further consideration of Mitchell's disability.  *Mayes*

15   *v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001).

16        I find that the new evidence is not material because it does not bear directly and

17   substantially on the ALJ's findings.  That is, there is no "reasonable possibility" the new

18   information would have affected the outcome of the administrative hearing.  *See Ward v.*

19   *Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982); *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d

20   1378, 1381 (9th Cir. 1984).  One of the conditions Mitchell listed in the declaration, vertigo with

21   severe migraines, cannot be relevant for review here because the condition was not among the

22   conditions presented to the ALJ as disabling and the medical records in the administrative record

23   discussing dizziness or vertigo would not support a conclusion that that condition was severe.  *See*

24   AR 11-12, 219, 351, 353, 354, 443, 457, 654, 678, 686; Mitchell Decl. at 2; *Mayes*, 276 F.3d at

25   _____

26   [6] The ALJ included the following technical information from the vocational expert's testimony
     and the *Dictionary of Occupational Titles* in his decision: "*document preparer* (DOT 249.587-
27   018, sedentary, SVP 2; 23,000 jobs nationally and 1,500 to 2000 jobs statewide), *addresser*
     (DOT 209.587-010, sedentary, SVP 2; 17,000 jobs nationally and 1,000 to 2,000 jobs statewide), and
28   *surveillance system monitor* (DOT 379.367-010, sedentary SVP 2; 11,000 jobs nationally and
     1,100 jobs statewide)."  AR 18.

United States District Court
Northern District of California

461 (holding that new evidence of back problems was not material because, "while [the clamaint's] past medical history indicated that she had had some back problems, none of the disabilities [she] claimed before the ALJ was a back problem."). The rest of Mitchell's declaration is a cursory recounting of conditions that are substantially similar to those analyzed in the ALJ's decision, though some are cast in more serious or slightly different terms. *See* Mitchell Decl. at 2-3; AR 11-12, 219. Small differences in these conditions, self-reported years after the ALJ's decision, would not have been determinative in the ALJ's findings. *See* Mitchell Decl. at 2-3; *Booz*, 734 F.2d at 1381.

The post-visit instructions, apparently made by Dr. Mishra, recommend an injection treatment for elbow epicondylitis. Mitchell Decl. at 7. This condition may be a new diagnosis for the pain that Mitchell and some of his doctors previously suspected could be carpal tunnel syndrome. *See id.*; AR 12, 364. There is, however, no indication in the Dr. Mishra instructions of the severity of the condition or whether the condition has ever been disabling, which would be necessary for finding that the new evidence was material. *See* Mitchell Decl. at 2, 5; *Jackson v. Apfel*, 162 F.3d 533, 539 (8th Cir. 1998) ("In order to be material, the evidence must relate to [the claimant]'s condition on or before the date of the ALJ's decision."). Similarly, the medications list, treating physician business card, and appointment reminder card would not be material in affecting the outcome of the ALJ's decision. Mitchell Decl. at 6.

Mitchell's submission of a March 2014 form on which Dr. Kanen indicated that Mitchell was not able to work suffers from similar problems of non-specificity. *See* Mitchell Decl. at 3. The form says that Mitchell needs surgery and that the onset date of Mitchell's condition was 1998. *Id.* But the one-page form does not indicate which condition (or set of conditions) has caused the purported inability to work, nor does it detail the timing of when the condition became severe enough to cause that inability. *Id.* No other documentation submitted by Mitchell provides that information. The 1998 onset date strongly suggests that any purportedly disabling conditions are the same ones reviewed and documented in the administrative record. An unsupported determination in 2014 that unspecified conditions were disabling at some unknown time does not create a reasonable possibility of overcoming the other evidence in the record and changing the

United States District Court
Northern District of California

1   ALJ's decision.  *See Booz*, 734 F.2d at 1381; *cf. Mayes*, 276 F.3d at 462 (claimant must provide

2   evidence that disabling condition existed at time of ALJ hearing).

3           Finally, even if any of the newly submitted evidence were material, Mitchell has provided

4   no good cause for why this evidence could not have been timely presented to the ALJ before the

5   ALJ's decision.  *See* Mitchell Decl. at 2-3.  The medical record before the ALJ was thorough and

6   reasonably covered the limitations Mitchell claimed prevented him from working at the time.  *See*

7   *id.*; AR 11-12, 14-15, 219; *Mayes*, 276 F.3d at 463 ("A claimant does not meet the good cause

8   requirement by merely obtaining a more favorable report once his or her claim has been denied.

9   To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable

10  earlier.").

**CONCLUSION**

12          For the reasons identified above, the ALJ's decision is free of legal error and supported by

13  substantial evidence.  Mitchell's motion for summary judgment is DENIED, and the

14  Commissioner's motion for summary judgment is GRANTED.

15          **IT IS SO ORDERED**.

16  Dated: December 12, 2014

WILLIAM H. ORRICK
United States District Judge